UNITED STATES *v.* AMERICAN GLANZSTOFF CORP. (No. 3949)[1]

[1] T. D. 48308.

United States Court of Customs and Patent Appeals, April 27, 1936

*Joseph R. Jackson*, Assistant Attorney General (*Charles D. Lawrence*, Specia Assistant to the Attorney General, and *Joseph F. Donohue*, special attorney, of counsel), for the United States.

No appearance for appellee.

[Oral argument April 9, 1936, by Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

American Glanzstoff Corporation, the appellee, made six entries of artificial silk yarn at the port of New York under the Tariff Act of 1930. The merchandise was invoiced and entered at 6.25 gold marks per kilo, less 5 per centum cash discount. The local appraiser appraised the goods at 6.58 gold marks per kilo, less 5 per centum cash discount. Reappraisement 107120–A was a test case, and the other reappraisements involved duress entries.

The importer appealed in each case to reappraisement and the cases were consolidated for trial, apparently by consent. The single judge held that the entered values were the dutiable values, and the Government appealed. The First Division of the United States Customs Court reviewed the matter and affirmed the decision of the single judge. The Government has brought the case here for review.

The difference between the appraisement made by the local appraiser and that of the courts below arises out of a so-called "loyalty" discount of 5 per centum claimed by the importer and disallowed by the local appraiser. The only question presented here is whether such discount should be allowed in arriving at the foreign-market value of the goods.

The evidence in the case consists of three reports made by Treasury representatives and customs agents. From these reports it appears that the goods are produced in Germany, and that the manufacturer's inland prices therefor are made solely through a Berlin syndicate named "Kunstseide Verkaufs Buero", which syndicate also makes all inland sales of these goods. It appears from the report of Treasury Representative Kruszewski that the goods are sold in Germany with a so-called "loyalty" discount of 5 per centum, which discount is cancelled if the purchaser buys "from outsiders." A regular cash discount is given to all purchasers. There is no dis tinction between wholesale and retail prices. No printed price lists are issued, the purchasers buying from mimeographed price lists sent to interested parties. It also appears from the report of Kruszewski that it was stated to him by Director Kisker of the syndicate that no cancellations of the "loyalty" discount had been made, and that the "loyalty" discount was regularly granted.

Under date of August 18, 1933, Kruszewski wired the department that "every invoice shows that it is subject to 5-percent loyalty discount if purchaser adheres to loyalty clause." Exhibit 2 also shows that on March 15, 1932, the syndicate put into effect the following rule: "The loyalty discount of 5% may be deducted until further notice from payments made on every invoice covering deliveries made after March 15, 1932", that on August 24, 1933, said rule was still in effect, and that "no change is contemplated in the future." However, under the same date, August 24, 1933, the report recites:

* * * If it is found out that the purchaser also buys from outsiders not belonging to the syndicate, then the gross list prices must be paid and the allowance of the loyalty discount of 5% is cancelled. According to Director Kisker such cancellations have so far not taken place and invoices checked were paid less 5% loyalty discount deducted by purchaser when remittance was made.

Treasury Representative Griebel reports (Exhibit 3):

There is a loyalty discount of 5% which is deducted on every invoice. It is allowed to all who purchase all their yarn from the members of the association. Mr. Preusner stated that about 99% of their customers receive this discount, the independent factories do not manufacture as good a quality as the association members, and consequently the purchasers buy here although prices are somewhat higher than the independent manufacturers charge.

Again he states:

* * * There is an association of the principal manufacturers of artificial silk in Germany which fixes the prices, discounts, and terms for all sales in the German market. (It does not control prices for export; this is an open market.)

The appellate division was of the opinion that the "loyalty" discount should be deducted in fixing foreign value because, although there was "a clause with reference to disallowance of the loyalty discount, it was not exercised, as there was no purchaser outside members of the syndicate."

As we view the matter, the question presented is one purely of law. Under the admitted facts, did the entered value of the goods, namely, the *per se* value of the goods, less 5 per centum discount for cash, less a further "loyalty" discount of 5 per centum, constitute the foreign-market value of the goods, within the meaning of the statute?

Section 402 (c) of the Tariff Act of 1930, thus defines foreign value:

Sec. 402 (c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The first inquiry is: What was the price at the time of exportation, at which the imported merchandise was freely offered for sale to *all* purchasers in the principal markets of the country? The expression "all purchasers" does not mean the members of some association only, or 99 per centum of the purchasers of such goods, or those who would not thereafter buy such goods from someone else, but it does mean all of those who cared to buy such goods in such markets. This condition is not complied with by showing that the allowance of the "loyalty" discount was not, in fact, cancelled at any time. The language of the statute is "freely *offered* for sale." (Italics ours.) If the offer has coupled with it the restriction that 5 per centum of the purchase price may be cancelled at the discretion of the seller, then the goods are not *freely offered* for sale at the price, less the loyalty discount, to *all* purchasers.

It appears that a member of the syndicate, Fr. Kuttner A. G., operating two factories in Saxony, stated to the Government representative that about 99 per centum of his customers received the "loyalty" discount, thus showing that a part of them do not receive the same.

The case is somewhat analogous to *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158. There, the Goodyear company produced tires in Canada, and, by an elaborate method of marketing, controlled the price of the product from factory to ultimate consumer. The tires were distributed by jobbers to dealers at prices fixed by the manufacturer. One provision of the conditions of sale to the jobbers was that if the jobber retailed a tire, he must do so at the retailer's price and then pay the dealer's price to the manufacturer for the tire so retailed; that is to say, should pay 10 per centum more than would be charged to him as a jobber, which 10 per centum was paid by the manufacturer to the dealer in whose territory the retail price was made.

This court held that the goods were not freely offered for sale in the ordinary course of trade, and, hence, found that no foreign value had been established.

It was thought by the appellate division that the decision of this court in *United States* v. *Michele Diagonale*, 22 C. C. P. A. (Customs) 517, T. D. 47497, is decisive here. On close examination, however, it will be found that the cited case was decided upon different principles and facts than those here involved, and that case is not thought to be controlling here.

We are of opinion, as a matter of law, that the so-called loyalty discount should not have been deducted in fixing foreign and dutiable value.

The judgment of the First Division of the United States Customs Court is *reversed* and the cause is *remanded* for further proceedings in accordance with law.

GARRETT and LENROOT, Judges, dissent.